Arthur D. WELLER and Helen F. Weller,
Appellants (Plaintiffs below),

v.

John E. DALZELL and Velma P. Dalzell,
Appellees (Defendants below).

David Cleveland BRUCE, Appellant
(Plaintiff below),

v.

John E. DALZELL, Appellee (Defendant
below).

Joseph W. SIMROCK, Appellant
(Plaintiff below),

v.

John E. DALZELL, Appellee (Defendant
below).

Nos. 3079–3081.

Supreme Court of Wyoming.

Oct. 23, 1962.

Before BLUME, C. J., and PARKER, HARNSBERGER, and McINTYRE, JJ.

Mr. Justice HARNSBERGER delivered the opinion of the court.

The separate suits brought by the Wellers against the Dalzells, and by Bruce and by Simrock against Dalzell, have been consolidated on the respective appeals of the plaintiffs to this court, although there are issues of fact and law involved in the Weller appeal which are somewhat different from those in the other two cases. Each of the appealing plaintiffs individually owned separate lands, but all the lands had been

used substantially as a unit by the Dalzells who, for some years, had separately leased them from each owner. Hereinafter the plaintiffs-appellants will be named in the singular.

The Weller complaint filed June 8, 1960, alleged that on March 1, 1953, a five-year written lease executed to the Dalzells had terminated, and thereafter the parties agreed to a year-to-year lease upon the same terms contained in the original five-year written lease, but with certain additional conditions. Weller further alleged the Dalzells failed to pay the rental when due; failed to properly care for, repair and replace personal property; failed to maintain and repair buildings, fences, and reservoirs; allowed livestock to graze, ruin, and destroy trees and shrubbery; failed to return personal property; subleased the premises without written permission; vacated the dwelling upon the premises; failed to account unto Weller for money advanced by Weller for repairs and improvements which were not made; and failed to assign Taylor Grazing Act leases at expiration of the lease. Weller prayed only for $20,000 damages.

The Dalzells filed a general denial and alleged the original written lease had been extended for an additional term of five years from March 1, 1958, and until March 1, 1963. The Dalzells also cross-complained, alleging that Weller, Simrock and Bruce, in order to deprive the Dalzells of their leases, conspired to interfere with the Dalzells' application for a loan by making false representations, all to the Dalzells' damage in the sum of $50,000 for which, with punitive damage of $25,000, judgment against Weller was prayed.

The trial court found generally for the Dalzells; that the five-year lease agreement of March 1, 1953, was extended for an additional term of five years by a written mutual agreement as set forth in Weller's cancelled check dated April 6, 1959; that the extended lease was valid and binding until March 1, 1963; and that the Dalzells had complied with all provisions of the lease except certain rental and tax payments which the Dalzells had offered to pay Weller. The trial court also found the Dalzells had not been deprived of their lease agreement, and, therefore, held against the Dalzells on their cross-complaint. Judgment was rendered according to these findings and Weller has appealed.

■ Although appellant Weller contends his action against the Dalzells was for termination of a lease agreement, the record does not bear that out. Weller's complaint only sought $20,000 damages for the Dalzells' alleged failure to perform the terms of a year-to-year lease which Weller claimed the parties had agreed upon as an extension of the five-year written lease dated March 1, 1953. Notwithstanding Weller's suit did not seek termination of any lease, appellant still continues to insist he had the right to terminate the year-to-year lease pleaded in his complaint, and claims that even if the Dalzells did have a five-year extension of the original lease, that extended lease had been breached and Weller was entitled to retake possession. This amounts to a reassertion by Weller that his action was for termination of lease, although for the different reason of alleged breach of covenants. Weller's complaint and the Dalzells' answer thereto do not raise any issue involving termination. They merely join issue on the alleged breach of contract and Weller's right to damages therefor. Weller does not seem to appeal from the judgment adverse to him upon the damage issue. However, the Dalzells cross-petitioned alleging the parties had extended the written March 1, 1953, lease for an additional five years, and the Dalzells prayed for its confirmation. Weller's answer traversed this cross-complaint, thus presenting an issue as to the validity and subsistence of the five-year extension of the March 1, 1953, lease. Weller's appeal must, therefore, be considered as being only from the judgment adverse to him on the extension issue.

Weller's appeal poses the usual questions —whether there is substantial evidence in

the record justifying the trial court's finding there was a five-year extension of the original March 1, 1953, lease between the parties, and whether there were any breaches of the lease warranting its termination.

Weller produced in evidence: His five-years lease of lands to the Dalzells dated March 1, 1953, which contained a provision that it might be extended for another term upon written mutual agreement of the parties; a letter dated September 25, 1957, from the Wellers to the Dalzells saying:

"This letter is to confirm our understanding and oral agreement made while at ranch. You are to receive a renewal lease, term 5 years under certain requirements that must be fullfilled [sic], namely, #1, the place is never to be abandoned nor the house vacated, this is to avoid cancellation of fire insurance. #2, buildings, corrals and fences must be kept in repair at all times. #3, materials to repair the house, bunk house, chicken house and pump house roofs, I agree to advance the cost, however, the sum so advanced shall be repaid to me, in 5 annual installments, beginning with the renewal of the lease, the rental terms shall remain the same as formally [sic]. You are to pay all labor cost on the above repair work.";

an unsigned copy of a letter dated May 11, 1958, from the Wellers to the Dalzells, saying:

"* * * In my letters, I mentioned that I would come to the ranch when the repair work was finished and a new lease drawn up at that time. * * *";

a letter dated May 22, from the Dalzells to the Wellers, stating:

"Fixing up a place with no more of a lease than we have—leaves us with the uncertaintly [sic] of just what to do. We have done all we can afford to do with out [sic] our lease—therefore its [sic] up to you to send our lease—this labor comes very high * * *. We should have more of an understanding or lease.";

a letter dated May 24, 1958, from the Wellers to the Dalzells, wherein it was stated:

"Beginning with our oral understanding while at the ranch concerning a new lease and verified in my letter dated Sept. 25, 1957, certain requirements had to be met before a renewal lease could be considered and which was fully understood and agreed upon.

*     *     *     *     *     *

"* * * We demand nothing that is not already an obligation on your part to fulfill under the lease you had with us.";

a letter dated September 15, 1958, from Mrs. Dalzell to the Wellers giving in some detail an outline of the repairs and improvements made; a letter from the Dalzells to the Wellers, dated October 15, 1959, reporting on fence matters and explaining it would be necessary to have a lease running until April, 1964, in order to obtain a needed loan from the F.H.A., and that they would like to have that lease by October 25, or as soon as possible, as they had to change their loan by the first of November; a letter dated November 24, 1959, from the Wellers to the Dalzells, saying:

"Gladly discuss making a new lease with you folks, however, we must settle our account first, under our present setup to ascertain how to proceed and that would be fair and just to all concerned.";

a letter dated January 26, 1960, from the Wellers to the Dalzells, stating:

"We have been advised that you have quit the cattle business, now what about this matter?

"Should the above be true, what about your future plans and are you vacating our ranch?

"The original five year renewal lease dated March First, 1953 and supplements thereto, expired March the First 1958. In September 1957 while we

were at Ranch we discussed a renewal lease orally, later after arriving home we put in writing our agreements and understandings based upon certain specific requirements and to which we all agreed upon.

"You accepted those requirements and conditions by remaining on the premises and we were willing to come to the ranch when you had completed the requirements at which time a new lease was to be signed. * * *";

and a letter dated February 13, 1960, from Mrs. Dalzell to Wellers, saying:

" * * * we had too [sic] sell the biggest part of our cattle—due to hard winter—low prices & feed shortage— however, we still have some left—and will have too [sic] take some stock in too [sic] pasture—*but figure it a good rest for the land for* this spring & summer *and let it go to seed*—of course we will have too [sic] use this land to make expenses as we will have too [sic] rebuild quite a bit of fence—and you can expect your lease money *on time* as *always*. * * *" (Emphasis not supplied.)

In his testimony Weller made reference to Dalzells' having a "tentative new lease" and said he told Dalzell when he performed according to oral and *written* statements, they would negotiate a new lease under the same terms and conditions.

Mrs. Dalzell identified, and there was received in evidence, Weller's letter to Pioneer Lumber Company dated March 16, 1959, in which Weller says he had received remittance from Dalzell, " * * * to cover the annual rental under the five year lease, dated 2–27–59 * * *."

Weller's September 25, 1957, letter to the Dalzells is by its own statement a written confirmation of the parties' oral mutual agreement to extend the term of the 1953 lease. The fact that both the oral mutual agreement to extend the term and the written confirmation, of that mutual agreement included certain additional requirements, to be kept and performed by the lessee during the period of the enlarged tenancy, which were not in the original lease, did not serve to destroy the augmented character of the lease. They merely appended additional requirements, the breach of which might result in the lease's defeasance.

Weller's insistence that the statement in Weller's letter means that Weller would agree to the lease extension only when the new requirements were met is on its face untenable. The fulfillment or breach of the new requirement that "the place is never to be abandoned" was incapable of ascertainment until either an abandonment occurred or the period expired without abandonment. Similarly, until breach or performance, it could not be determined whether the requirement for repair of buildings, corrals, and fences had been satisfied. In like manner it could not possibly be known if Dalzells would repay monies advanced by Weller for repair materials, until Weller made such advances. Evidently Weller did not place such a strained construction upon the wording of his letter of confirmation at the time he wrote the Pioneer Lumber Company letter, as he now advances, for in it he said he had received Dalzell's letter "with remittance to cover the annual rental under the *five year* lease, dated 2–27–59." (Emphasis supplied.) It is not known why Weller used the date reference "2–27–59", and this is not explained in the briefs of either party to this appeal. Nor does Weller indicate he entertained his present contention in this regard when he wrote Dalzells on March 16, 1959, setting forth instructions to Dalzells and saying when he would send Dalzells certain remittances, followed by:

" * * * Foregoing applies to the arrangment [sic] made in the renewal of our lease, the *supplements* which are in writing." (Emphasis supplied.)

And Weller must have had a different idea than that for which he now contends, when he wrote on the face of his check dated "4–6–59" to the Dalzells, "Material costs

Ranch advance under lease", and typed on the back of that check:

"Endorcements [sic] constitutes [sic] loan for materials purchased on their account from Pioneer Lbr. Co. and applies in full settlement of the ranch lease arrangement. Repayment to be made in 3 equal annual installments of $62.49 each, same to be added to ranch annual rental, namely, on Mch. 1, 1960, Mch. 1, 1961 and Mch. 1, 1962."

under which the Dalzells both signed their names endorsing the check.

Although both counsel at times sought expressions from witnesses as to the meaning of the exhibits, the trial judge properly ruled they were to be interpreted by the court.

█ The evidence above recounted was ample to support the court's conclusion that there was compliance with the extension provision of the 1953 lease which required that the five-year lease might be extended for another term upon written mutual agreement of the parties thereto.

█ There has been a distinction drawn between a renewal and an extension, the courts treating an extension as a demise for the full period to which the term is extended. In the instant case this would make the full term of the 1953 lease a term of ten years, providing only that the exercise of the right to extend was made in the manner required by the extension provision of the 1953 lease. As the word used in the lease provision is "extended" there is no reason to consider it meant other than to permit an extension of the lease period rather than to provide for a renewal of the lease. Under a proper interpretation of the extension provision, the making of a new lease was unnecessary and the continued tenancy of the Dalzells was under the original 1953 lease as extended. See 32 Am.Jur., Landlord and Tenant, § 956, p. 805.

Respecting the alleged breaches of the lease by Dalzells, Weller testified on cross-examination that in 1957 and 1958, he said nothing to Dalzell about loss of trees; that "as far as the fences was [sic] concerned, that was taken care of" and that Dalzell took pretty good care of trees and kept stock out; that he accepted the rent for 1959 but refused it for 1960; that Dalzell paid 1958 taxes and Weller paid the taxes for 1959 after he started this suit; and that he told the Bureau of Land Management Dalzell was clear out of the picture, he was firing Dalzell, and that Dalzell did not have a lease from Weller, Bruce or Simrock.

Mrs. Dalzell testified: That when they entered the premises in 1950 they were in a deplorable condition; that the fences were run down; that Dalzells fixed the fences and put in electricity; that the trees are now in as good condition, if not in better condition, than when entry was made; that the Dalzells had lived on the place continuously for about ten years except for occasional visits to daughters; that "three years ago this last June", which is understood as meaning either June of 1958 or 1959, Weller's wife told Mrs. Dalzell the place was better than it ever was; that until Weller sent the eviction notice, Weller never complained about the fences or trees; that Weller's check of $516 was for certain bathroom fixtures purchased at a cost exceeding $725, and Dalzell added and paid for a pump and septic tank costing $500, and dug ditches to put them in; that Dalzell also bought $1,179 of equipment from a plumbing company; that a water well man bought her horse and he drilled a well to connect with bathroom fixtures; that she considered the endorsement on Weller's check, dated April 6, 1959, to the Dalzells' order, which Weller had produced in evidence, an extension of the March 1, 1953, lease, and which read on the face, "Material costs Ranch advances under lease" and on its back:

"Endorcements [sic] constitutes [sic] loan for materials purchased on their account from Pioneer Lbr. Co. and applies in full settlement of the

ranch lease arrangement. Repayment to be made in 3 equal annual installments of $62.49 each, same to be added to ranch annual rental, namely, on Mch. 1, 1960, Mch. 1, 1961 and Mch. 1, 1962.

"/s/ John Dalzell
"/s/ Velma Dalzell";

that the Dalzells always paid the taxes until Weller, "demanded to evict us"; that in February 1961 Weller told her if she would assign the Dalzell Taylor Grazing lease, her husband would not need to know about it and Weller would not sue for damages; that until eviction notice was received, Dalzells had paid taxes and they were willing to pay the rent and the yearly adjustments agreed upon; that the fences were kept tight and the place was in better condition than it had ever been known to be; that the place has water, lights, telephone, gravel road, flowers, and fences; that an apparent washout at the reservoir was sand blown in by storm and then washed out by rain; that the reservoir held water; that Weller did not buy staples or wire; that Weller said he was glad Dalzell had saved so many trees; that Dalzell had never subleased Weller lands to anyone; that pictures showing a portion of the fence being down were taken at a place where the wires had been let down to allow driving a truck through; that the house was never abandoned; that repairs had been made on buildings, fences, and corrals, but Weller told Dalzell to leave the barn roof alone; that a terribly high wind tore off the roof of the chicken house; that Weller only sent $187 for roofing that cost $800; and that Weller knew there were times Dalzells were away from his place but said that didn't " 'make so much difference as long as it's livable' ", which the witness said it certainly was.

John Dalzell testified that he had been on the place continuously since 1949 and until these proceedings; that the rent was all paid when he met with the three plaintiffs in February 1960, and that he then tendered $590 rent by certified check and that he had $62.49 additional to pay Weller in accordance with the notation on Weller's $187.47 check, which was dated "4–6–59", and tendered it to Weller but could not get Weller to take the money or the check; that he was always ready, willing, and able to pay the taxes and any back rent; that he went to pay the 1959 taxes but found Weller had already paid them; that he paid the Taylor Grazing lease rental; that he owes nothing to Weller but Weller still owes him; that he had never billed Weller for any improvements that he had not made; that when the lease extension was made he moved back to the Weller place and that he never abandoned the Weller place; that he bought the wire, staples, and posts which Weller should have paid for; that the farming equipment on the place was bought about 1920–25 and the buildings were in poor shape in 1950; that things are generally better than before; that Weller's picture of the dam showing an apparent gap was a picture of the dam spillway; that pictures of down fences were old dry-farmer fences not supposed to be kept up and that they served no useful purpose now; that livestock was not allowed to graze around the trees and shrubbery which are in much better condition now; and that porcupines had killed some trees.

Witness Etchemendy, under cross-examination by Weller, identified Etchemendy's $1,200 check to Dalzell upon which was written, "lease until March 15th 1960 in full", and another check for $750 upon which was written, "lease on 4000 acres pasture until April 1st 1961", also an instrument to which Dalzell and Etchemendy were parties entitled, "Grazing Permit", dated January 11, 1960, granting Etchemendy the privilege of grazing sheep, and another instrument entitled, "Share Agreement", dated April 1, 1960, which provided Dalzell and Etchemendy should pasture and care for 1,200 of Etchemendy's ewe sheep on a crop-share basis. Etchemendy testified he wanted to change the deal because he was served with notice to vacate the premises; that he told the man

he was leasing; that he was not leasing the entire premises, just grass; that Dalzell lived in the house and he saw him around the house several times; that he was told to get off in February 1960; and that if leases were valid he would complete his agreement with Dalzell.

The witness Suranyi testified that in 1950 water was hauled to the place in barrels, but in 1961 they had running water; that the trees were much better; that she saw no fences down although one inside fence needed repair; that the chicken house was pretty good and she saw nothing wrong with the windbreak by the shed; and that the corral was all right.

Witness Stolcis testified that she was at the ranch hundreds of times; that when Dalzells moved there the place was in a deplorable condition; and that in 1960 the buildings, house, trees, and shrubbery were in much better condition.

From this evidence the trial court was entitled to believe Dalzells had either paid or offered to pay all rentals and taxes due under the extended lease; that Dalzells had properly maintained and repaired the buildings, fences, and reservoirs; that Dalzells had not allowed livestock to graze, ruin, and destroy trees and shrubbery; that Dalzells had not subleased the premises or vacated the dwelling upon the premises; and that Dalzells had not failed to account unto Weller for money advanced by Weller for repairs and improvements which were not made.

Furthermore, Weller failed to show there was personal property which the Dalzells should have returned to Weller, and which they either failed or refused to give Weller. Similarly there was no showing that there was an obligation on Dalzells' part to assign to Weller the Taylor Grazing leases.

The judgment in favor of Dalzells and against Weller must, therefore, be affirmed.

The Bruce and Simrock complaints, filed June 8, 1960, allege that about November 4, 1959, Dalzell requested plaintiffs to cancel his written leases with them and enter into new leases, upon condition that Dalzell would return such new leases if Dalzell failed to obtain a loan from Farmers Home Administration; that Dalzell did not obtain the loan but nevertheless refused to deliver up the new written leases. Dalzell generally denied; alleged he and plaintiffs entered into valid five-year written leases on November 4, 1959, but plaintiffs refused Dalzell's tender of rental payments. Also in a cross-complaint, Dalzell charged plaintiffs with conspiring to avoid their leases with him and to deprive him of certain grazing leases, and asked $50,000 damages and $25,000 punitive damages from each of those plaintiffs.

The court found Bruce and Simrock failed to prove the allegations of their complaints by competent evidence; that even if there were oral conditions to the November 4, 1959, written leases, the conditions were violated by plaintiffs, and dismissed plaintiffs' complaints. Additionally, the court held the November 4, 1959, leases were valid and binding, but denied defendant's claims for damages, as Dalzell still had his leases. Plaintiffs have appealed from these judgments.

Appellants Bruce and Simrock agree that the only issue in controversy upon their appeal is whether or not the delivery of their leases dated November 4, 1959, and by their own terms not to expire until April 1, 1964, were conditioned upon the Dalzells obtaining a loan.

As in the Weller appeal, this court is not concerned with any conflicting testimony given by plaintiffs and upon which appellants' counsel seems to rely, for in the face of conflicting evidence this court regards only the evidence most favorable to the successful party on appeal together with all fair inferences which may reasonably be given it.

The undisputed evidence is that Dalzells wanted the leases in question in order that they could comply with the F.H.A. requirements for obtaining a loan. But it is

clear that the positive testimony given by the Dalzells was that these new leases were not given upon any condition that the leases would be returned to the lessors in the event the Dalzells did not receive their requested loan. It was the trial court's right to weigh conflicting evidence and with that court's conclusion this court will not interfere. The honesty, integrity, and reliability of the Dalzells' evidence remains unassailed. The leases themselves contain no such condition as that relied upon by Bruce and Simrock, and the trial judge was entitled to choose as to which testimony was the more convincing.

The judgments in favor of Dalzells and against Bruce and Simrock will, therefore, also be affirmed.

Cases Nos. 3079, 3080, and 3081 affirmed.