Elta McCLELLAN, by and through her Conservator; the Estate of Arthur L. McClellan, by and through its Personal Representative; and the Double S Sheep Company, a Wyoming corporation, Appellants (Plaintiffs),

v.

Patricia BRITAIN and Oscar Robert Britain, Appellees (Defendants).

No. 91–120.

Supreme Court of Wyoming.

Feb. 11, 1992.

Ann M. Rochelle of Williams, Porter, Day & Neville, Casper, for appellants.

Cherie Shelton Norman of Skiles & Hageman, Laramie, for appellees.

Before URBIGKIT, C.J., THOMAS and MACY, JJ., BROWN, J. (Retired), and LEHMAN, District Judge.

BROWN, Justice, Retired.

Over a twenty year period, in five-year increments, appellees Patricia and Oscar Robert Britain (Britains) leased lands from appellant, The Double S Sheep Company (Double S). After the leasing year 1988, a dispute arose with respect to whether a lease for an additional five years had been effected. The trial court determined that it had and entered summary judgment accordingly.

The single issue on appeal is: Was summary judgment properly granted?

We affirm.

Britains first leased grazing land from Double S in 1968 for a period of five years. Arthur L. McClellan and Elta McClellan were the sole shareholders in Double S. The parties continued to execute new leases at five year intervals. The 1978 lease included a provision that the Britains have a right or option to renew the lease for five years; the Britains would pay the first year's rental and a portion of the final year's rental upon execution; and succeeding payments would be made on an annual basis. The lease also included an option to renew, which stated that the Britains could exercise their option to renew by giving notice to Double S in writing via registered mail, return receipt requested, not less than thirty days before the expiration of the lease. The Britains exercised their rights under this option and the parties executed a new lease in 1983. The renewal provision of the 1983 lease provided:

6. Lessor [Double S] covenants and agrees to give Lessees [Britains] the first right or option to renew this lease for an additional five year term commencing December 10, 1988, provided Lessor does not intend to use the lands for its own purposes or for the sale thereof and provided that Lessees shall give notice in writing to the Lessor, sent registered mail, return receipt requested, to the Lessor's Casper, Wyoming address not less than thirty (30) days prior to the expiration of the primary term of this lease and provided further that Lessees pay the amount of rental offered by some other responsible party.

In 1986, the parties entered into an Agreement Revising Terms of Lease. The new agreement modified the terms of payment and required the Britains to make monthly, rather than annual, payments and to pay in full the final year of the lease before the commencement of the final year.

On November 6, 1988, a month before the expiration of the 1983 lease, Robert Britain sent notice to Double S stating his intent to exercise his renewal option. The notice was sent certified mail, return receipt requested in compliance with provision 6 of the lease. Following delivery of the notice, Britain commenced negotiations with Art McClellan, President of Double S, with respect to the amount of rent. On February 22, 1989, Britain sent a letter to McClellan offering to pay $7,500 a year at $625 per month on a new five-year lease to run from December 10, 1988 to December 10, 1993. Consistent with earlier leases, Britain also offered to pay $1,000 toward the last year's payment on December 10 of every year until December 1992, when he would pay $3,500, which constituted the balance remaining on the final year.

Enclosed with the February 22, 1989 letter was a check to Double S in the amount of $2,500. Britain noted on the check that the payment was for the first four months of the new five-year grazing lease. The check was endorsed by Art McClellan as President of Double S on March 9, 1989.

On April 4, 1989, Patricia Britain sent Double S a check in the amount of $2,250. The notation on her check stated that it was to cover the April and May lease payments, plus $1,000 toward the rent owing on the last year of the lease. This payment was also accepted by Art McClellan. The Britains filed a notice of real estate lease on April 24, 1989 and mailed a copy to Double S. Art McClellan died in May 1989.

The Britains continued to pay rent to Double S and these checks were accepted. In late 1989, another $1,000 was paid toward the last year of the lease. In accepting one of the checks, Elta McClellan, the secretary of Double S Sheep Company, wrote on the back of the check, "partial payment of lease."

Double S, in an amended complaint, alleged that there was no valid lease and that the Britains were not paying an adequate rental amount. The Britains moved for summary judgment on October 15, 1990. The basis of their motion was that they had complied with paragraph 6 of the 1983 lease. They contended that once they complied with that provision, the lease was renewed, notwithstanding the fact that no new written lease had been executed. Succinctly, the Britains contended that notice was sent to Double S before the expiration of the current lease which gave notice of the Britains' intent to renew; that Art McClellan accepted two payments which on their face stated that they were tendered in partial satisfaction of the lease; that Elta McClellan endorsed one of the checks with the notation "partial payment of lease"; and that all checks have since been accepted. In its brief, Double S states that some of the checks have been held.

Because there was no issue of material fact, and compliance with paragraph 6 was complete, the Britains asserted they were entitled to summary judgment. Double S opposed the motion for summary judgment. The materials submitted in support of their opposition consisted of affidavits of Elta McClellan, Phil Gordy and George Hornberger and the depositions of the Britains. Double S further requested that the court take judicial notice of the estate of Arthur McClellan probate file, a lawsuit involving the various shareholders of Double S, and the records in the Secretary of State's office regarding Double S. Summary judgment was granted to appellees on March 25, 1991 and appeal followed.

■ "When reviewing a summary judgment on appeal, our duty is the same as that of the district court in that we have before us the same material and must fol-

low the same standards." *Noonan v. Texaco, Inc.*, 713 P.2d 160, 162 (Wyo.1986). *See also Jones v. Chevron U.S.A., Inc.*, 718 P.2d 890 (Wyo.1986).

"A motion for summary judgment places an initial burden on the movant to make a prima facie showing that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law. Rule 56(c), Wyoming Rules of Civil Procedure. Once a prima facie showing is made, the burden shifts to the party opposing the motion to present specific facts showing that a genuine issue of material fact does exist. *England v. Simmons*, Wyo., 728 P.2d 1137, 1140–1141 (1986). We analyze challenges to a grant of summary judgment by reviewing the record in a light most favorable to the party opposing the motion giving him all favorable inferences that can be drawn from the facts." *TZ Land & Cattle Co. v. Condict*, 795 P.2d 1204, 1208 (Wyo.1990) (quoting *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo.1987)). In order to defeat a summary judgment motion, the opposing party must, by affidavits or depositions, raise specific facts, not conclusions. *Davenport v. Epperly*, 744 P.2d 1110, 1112 (Wyo.1987).

■ The evidence submitted by the Britains in support of their motion for summary judgment was sufficient to make a prima facie case that renewal of the lease had been effected. After a prima facie case was made, the burden shifted to Double S to show that a genuine issue of material fact did exist. *TZ Land & Cattle Co.*, 795 P.2d at 1208. Double S did not meet that burden.

■ Double S' opposition to motion for summary judgment filed on January 31, 1991, never explained how its evidentiary material was relevant to the summary judgment motion. None of the materials referenced by Double S served to rebut the prima facie showing the Britains made in their motion for summary judgment.

Elta McClellan's affidavit stated that the corporate status of Double S had been revoked and that at no time did she or Dou-

ble S enter into a lease with the Britains. The affidavit further stated that to the best of Mrs. McClellan's knowledge, Art McClellan did not enter into a lease with the Britains on behalf of himself or Double S. The affidavit went on to raise the issue of litigation regarding the shareholders of Double S and stated that the present rental amount "is not a fair price." Finally, the affidavit stated that, in accepting one payment, Mrs. McClellan did not acknowledge a five-year lease but only acknowledged receipt of one check.

The affidavit of Phil Gordy stated that he typed a letter for Mr. McClellan to the Britains, but did not state when the letter was prepared or mailed. The letter attached to the affidavit is undated, unsigned and does not state the Britains' correct address. Nothing in either the letter or the affidavit contradicts the facts set forth by the Britains. Robert Britain denied that he had received the letter.

The affidavit of George Hornberger stated that the lease price was unreasonable, that the fair annual rental in December 1988 would have been $15,000, and that a responsible party would have offered such a price. The affidavit never stated that $15,000 or any other amount was ever offered by a responsible party. Paragraph 6 of the lease was clearly conditioned, not on a perceived rental value, but on "the amount of rental *offered* by some other responsible party." (Emphasis added.)

Because Double S did not contradict either the law or the facts offered by appellees, summary judgment was granted in the Britains' favor. Double S did not, and could not, show lack of compliance with paragraph 6 of the lease. In sum, we hold that the materials offered by Double S in opposition to the motion for summary judgment are conclusory or have nothing to do with the issues of this case. These materials do not demonstrate an issue or rebut the prima facie case made by the Britains.

## STATUTE OF FRAUDS

■ As a secondary issue, Double S raises the statute of frauds in opposition to the granting of summary judgment, though ap-parently the issue was not raised in the trial court. Wyo.Stat. § 1–23–105 (1988) provides in pertinent part:

> (a) In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith:
>
> (i) Every agreement that by its terms is not to be performed within one (1) year from the making thereof;
>
> \* \* \* \* \* \*
>
> (v) Every agreement or contract for the sale of real estate, or the lease thereof, for more than one (1) year[.]

An agreement may consist of more than one document. *Busch Development, Inc. v. City of Cheyenne*, 645 P.2d 65, 68 (Wyo. 1982). Here, the agreement between the parties consisted of the letter of November 6, 1988, giving notice of intent to renew the lease; the letter of February 22, 1989, setting out the terms of the proposed lease; and other writings in the form of checks consistent in amount with the proposal of February 22, 1989. The checks contained notations on the face that they were for grazing lease payment on the lease from December 10, 1988 to December 10, 1993. One of the checks was endorsed with the notation "partial payment of lease." We believe that the two letters, together with checks and notations, may be sufficient, standing alone, to satisfy the statute of frauds requirement that there be "some note or memorandum." *English v. Standard Optical Co.*, 814 P.2d 613, 616 (Utah App.1991). However, there is more. Courts have held that where the extended term of the renewal is fixed in the original lease and comes into existence by the exercise of the option and the giving of the required notice, the lessee holds for the extended term by virtue of the original lease which is in writing and satisfies the statute of frauds. *Kaybill Corp., Inc. v. Cherne*, 24 Ill.App.3d 309, 320 N.E.2d 598, 608 (1974). *See Gruber v. Castleberry*, 23 Ariz.App. 322, 323–24, 533 P.2d 82, 83–84 (1975); *Continental Builders, Inc. v. Leach*, 5 Kan.App.2d 766, 625 P.2d 5, 6 (1981); *Khourie Brothers v. Jonakin*, 222

Ky. 277, 300 S.W. 612, 614 (1927); *Kozy Theatre Co. v. Love,* 191 Ky. 595, 231 S.W. 249, 252 (1921); *Hurlburt v. Gullo,* 750 P.2d 613, 615 (Utah App.1988). Wyoming cases hold that either partial or full performance by one party to an alleged contract may remove it from the statute of frauds. *Lambousis v. Johnston,* 657 P.2d 358, 360 (Wyo.1983); *Fleming v. Goggins,* 375 P.2d 474, 476 (Wyo.1962).

## DEAD MAN'S STATUTE

Although it is discussed in its appellate brief, as far as we can tell Double S did not raise the dead man's statute in the trial court.[1] It relies on *Consolidated Construction, Inc. v. Smith,* 634 P.2d 902 (Wyo.1981) for its argument on the "dead man's statute." That case held that, while the testimony of an adverse claimant by itself is not sufficient to establish a deceased party's words or deeds, such testimony may be corroborated by other sources, such as deeds, records or reports. Most of the testimony regarding conversations between Robert Britain and Art McClellan appeared in Britain's deposition, which was taken at Double S' request. While Britain's affidavit in support of summary judgment alluded to negotiations over the rental amount, the specific facts that formed the basis of the motion consisted of the notice of intent to renew and the acceptance of payments. These facts were established by corroborating documents, namely, the copy of the notice, the registered mail receipt and the two checks accepted and cashed before Art McClellan's death. The statements made by McClellan, and shown in the record, are corroborated by numerous other materials referred to in this opinion. Actually, oral statements made by McClellan need not be relied on to sustain the summary judgment. There are other materials that sufficiently support the Britains' prima facie showing that a lease for an additional five years had been accomplished.

## RENEWAL vs. EXTENSION

The legal distinction between an option to renew a lease or the lessee's right to extend a lease is often overlooked in case law. In the present case, the document uses the term "renewal." However, the language of the lease is not solely determinative. In Massachusetts, one state which honors the distinction, the rule is that "[a]n option to renew requires that a new lease be executed 'or a formal extension of the existing lease, or something equivalent thereto.'" *Anderson v. Lissandri,* 19 Mass.App. 191, 472 N.E.2d 1365, 1367 (1985) (quoting *Leavitt v. Maykell,* 203 Mass. 506, 509, 89 N.E. 1056 (1909)). An option to extend a lease for a definite period of time requires no further act by the parties so long as the lessee complies with the terms of the option to extend the lease. *Id.* In *Anderson,* the lease included the phrase "option to renew" which the court termed some evidence of the parties' intent. *Id.* However, the court said the use of the word "renewal" in a lease provision was not enough to prevent the court from construing the provision as an extension where an extension is shown by the circumstances intended by the parties. *Id.* The court found that the use of option language calling for renewal "upon the same terms and conditions" as the original lease really created an option to extend a lease rather than option to renew. *Id.* The court was persuaded that the parties did not contemplate renegotiation or the drafting of a new lease.

In *Weller v. Dalzell,* 375 P.2d 467, 470 (Wyo.1962), the court determined that a lessor, by his conduct, may acquiesce in the extension of a lease even though a new written lease is never executed. The distinction between *Weller* and the case here

---

**1.** Wyoming's version of the "dead man's statute" is Wyo.Stat. § 1–12–102 (1988) which provides in part:

In an action or suit by or against a person who from any cause is incapable of testifying, or by or against a trustee, executor, administrator, heir or other representative of the person incapable of testifying, no judgment or decree founded on uncorroborated testimony shall be rendered in favor of a party whose interests are adverse to the person incapable of testifying or his trustee, executor, administrator, heir or other representative.

is that the operative word in the *Weller* lease was "extend" while the instant lease uses the word "renew."

Courts have generally held that while an extension continues the original lease, a renewal requires a new lease. *Unity Investors Limited Partnership v. Lindberg,* 421 N.W.2d 751, 754 (Minn.App.1988). *See Gibbs Realty and Investment Corp. v. Carvel Stores Realty Corporation,* 351 Mass. 684, 223 N.E.2d 534, 535 (1967).

We will consider whether a renewal will be inferred if the tenant performs all the conditions necessary to exercise his option, despite the fact that there is no new written lease. Some courts have applied a further distinction between renewal and extension to the effect that in an extension, a tenant exercises his option merely by holding over and paying his rent, while the renewal tenant must exercise his option by an affirmative act, though that act may be less than a formal execution of a new lease. *Kozy Theatre Co.,* 231 S.W. 249; 50 Am. Jur.2d *Landlord & Tenant,* § 1181 (1970).

Generally, the affirmative act consists of giving the appropriate notice under the renewal provision. Courts have held that, if the tenant effects the notice provision as specified, the renewal is enforceable even without a new written lease. *Altman v. Alaska Truss and Manufacturing Co., Inc.,* 677 P.2d 1215, 1221 (Alaska 1983); *McCutchin v. SCA Services of Arizona, Inc.,* 147 Ariz. 234, 709 P.2d 591, 593 (1985); *Khourie Brothers,* 300 S.W. at 614; *Kozy Theatre Co.,* 231 S.W. at 251; *Gibbs Realty and Investment Corp.,* 223 N.E.2d at 534–35; *Unity Investors Limited Partnership,* 421 N.W.2d at 754; *Cassinari v. Mapes,* 91 Nev. 778, 542 P.2d 1069, 1071 (1975); *Jador Service Co. v. Werbel,* 140 N.J.Eq. 188, 53 A.2d 182, 184 (1947); *Upland Industries Corporation v. Pacific Gamble Robinson Company,* 684 P.2d 638, 641 (Utah 1984). ■ The fact that the renewal provision calls for renegotiation of the rent does not affect the enforceability of the renewal once the tenant has exercised his option. *Altman,* 677 P.2d at 1221; *Cassinari,* 542 P.2d at 1071. In addition to the tenant's proper exercise of the option, the landlord's

depositing the rental checks created an acceptance of the offer to renew the lease, although there is no new written lease. *Fun Products Distributors, Inc. v. Martens,* 559 P.2d 1054, 1058 (Alaska 1977); *Prince Enterprises, Inc. v. Griffith Oil Co., Inc.,* 8 Kan.App.2d 644, 664 P.2d 877, 882 (1983). We note that Double S asserted in its brief that some of the checks were not cashed. Acceptance of rent, even when the checks are held and not cashed is evidence that Double S recognized the extension or renewal of the lease. *Doubledown Realty Corp. v. Gibbs,* 122 Misc.2d 32, 469 N.Y.S.2d 887, 889 (1983).

A renewal provision becomes enforceable once the tenant has exercised the option because the option itself constitutes part of the consideration of the original lease. *Cassinari,* 542 P.2d at 1071. The use of the word "renewal" in the lease is often not conclusive as to whether a renewal or an extension is intended, especially if the conduct of the parties lends credence to the notion that they intended to continue pursuant to the old lease. *Gibbs Realty and Investment Corp.,* 223 N.E.2d at 535; *Jador Service Co.,* 53 A.2d at 184.

■ If the lease fails to specify that a new lease is required, then the tenant's actions in giving notice and paying rent will be found adequate to support a renewal. *Jador Service Co.,* 53 A.2d at 184. If the tenant has complied with every condition of the renewal clause, as in this case, then he has done all that is required of him in order to renew the lease. *Id.; Khourie Brothers,* 300 S.W. at 614; *Kozy Theatre Co.,* 231 S.W. at 251.

## OTHER ISSUES

The court is asked by Double S to take judicial notice of conservatorship of Elta McClellan's estate, the estate of Arthur L. McClellan, and litigation over the shares in Double S (now defunct). Double S makes no effort to show the significance of these facts of which we are asked to take judicial notice. None of these circumstances can rebut the facts shown by the Britains in

support of their motion for summary judgment.

Thus, we hold that the district court properly granted the Britains' motion for summary judgment.

Affirmed.