**FOUR SEPARATE PARCELS
OF LAND, Appellant,**

v.

**CITY OF KODIAK, Appellee.**

No. S–6799.

Supreme Court of Alaska.

Feb. 21, 1997.

Rehearing Denied March 27, 1997.

Gerald W. Markham, Kodiak, for Appellant.

Melvin M. Stephens, II, Kodiak, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

Gerald Markham, owner of certain parcels of land in Kodiak, appeals the entry of judgment by the superior court following a jury verdict regarding the value of land taken by the City of Kodiak for a road expansion project.

## II. FACTS AND PROCEEDINGS

In 1991, the City of Kodiak (the City) made public its plans to condemn four parcels of land to allow the widening of Mill Bay Road. Gerald Markham owned two of the parcels to be condemned, subsequently labeled Parcels III and IV. The other two parcels were owned by Sung Kim and Duane and Nancy Freeman. The condemnation of Parcel III lies at the center of this litigation.

Parcel III is a portion of three contiguous lots along Mill Bay Road, labeled Lots 3, 4, and 5. Lot 3 was unimproved. Lot 4 contained two houses, which gave it non-conforming use status, and Lot 5 contained one house and a shed.

The house on Lot 5 was occupied by Andrew Lundquist under the terms of a contract between Markham and Lundquist. Under the contract, Markham provided Lundquist occupancy of certain office space and the house on Lot 5 "or a comparable residence" rent-free. In exchange, Lundquist assumed certain managerial responsibilities

relating to rental properties held by Markham in Kodiak. The contract was terminable by either party upon sixty days' notice. The contract was intended to allow Lundquist to exclude the rental value of the property from his taxable income under § 119 of the Internal Revenue Code.[1]

The area taken by the City for the right of way was a strip along the northwest edge of Lots 3, 4, and 5, parallel to Mill Bay Road, ranging between 8.99 and 9.82 feet in width. The total area condemned was 1,124 square feet.

According to the City's survey, one of the houses on Lot 4 already encroached upon the existing right of way for Mill Bay Road. The remainder rested primarily within Parcel III, the condemned area. The City's survey also showed the house on Lot 5 as encroaching upon the existing right of way, with the rest of the house partially on Parcel III and partially on the remainder of Lot 5.[2]

The City commenced negotiations to purchase either Parcel III or the entirety of Lots 3, 4 and 5 based upon the appraisal of William Roberts, a private real estate appraiser retained by the City. After negotiations failed, the City, on June 5, 1992, filed a condemnation complaint and a declaration of taking for the four parcels. The City deposited $113,000 with the court for the four parcels, $92,000 of which was the estimated fair compensation for the strip of land constituting Parcel III. The City later amended its declaration of taking, correcting an error in the original declaration. The original declaration reflected the estimated value of all of Lots 3, 4 and 5, rather than the value of only Parcel III and the houses which sat upon that strip. The amended declaration estimated the value of Parcel III as $24,500.

Markham filed an answer to the complaint on June 29, 1992, challenging the City's estimate of the value and the necessity of the

---

1. 26 U.S.C. § 119(a) provides an exclusion from gross income for the value of lodging furnished to an employee by an employer for the convenience of the employer "if ... the employee is required to accept such lodging on the business premises of his employer as a condition of his employment."

2. Markham denied that any of the houses encroached upon the existing right of way. Though he recognizes that he has little documentation to support it, he maintains that the State reached a settlement in the mid–1970's with his mother, then the owner of the property, ensuring that the houses did not encroach.

taking. On July 15, the Freemans, the owners of Parcel II, filed an answer to the City's complaint and a demand for a jury trial.

On August 28, the City and Markham entered into a stipulation before the court. Under the stipulation, Markham withdrew his objections to the declaration of taking for Parcels III and IV and acknowledged that he did not seek and was not entitled to just compensation for the taking of property other than Parcels III and IV. He reserved the right to contest the compensation due for Parcels III and IV. As to the issue of the houses and the alleged encroachment, the parties stipulated:

> For all the purposes in the future of these proceedings Plaintiff and Mr. Markham stipulate and agree that the just compensation to be awarded Defendant Markham for Parcel III shall be determined without regard to any alleged encroachment of these two houses into the right of way of Mill Bay Road. In other words, for purposes of establishing the compensation due to Mr. Markham as a result of the condemnation of Parcel III, there shall be no deduction or argument that there should be a deduction for any actual or apparent encroachment of either of the houses on that parcel into the existing Mill Bay Road right of way.
>
> Notwithstanding the above, and without otherwise affecting the amount of compensation to which he is entitled, the parties agree that Mr. Markham shall have the right, at his sole expense, to remove either or both houses which presently sit partially on Parcel III from that parcel....

The stipulation also provided that, since the City's estimated value in the declaration of taking was based upon a valuation assum-

ing an encroachment into the existing right of way, the City would have the right to amend its estimation of fair market value and to adjust its deposit of funds with the court accordingly. The City did so by filing a second amended declaration of taking which estimated the value of Parcel III at $43,605. The estimated combined value of Parcels III and IV was consequently $46,205. The City adjusted the funds on deposit with the court accordingly.

Markham subsequently moved the houses under the terms of the stipulation. He moved the house on Lot 5 back from the condemned strip and moved the house on Lot 4 to a subdivided portion of Lot 3, which Markham calls Lot 3–B.[3]

Shortly before the trial began, Duane and Nancy Freeman settled with the City and were dismissed as parties under a stipulation to the court.

Three appraisers testified at the jury trial. William Roberts first testified for the City. He testified that there are three accepted methods for appraising property: the direct sales comparison approach, in which the appraiser examines recent sales of similar property; the replacement cost approach, in which the cost of building a replacement structure is estimated, less deductions for depreciation; and the income approach, which estimates the value of the rental income to the owner. Roberts testified that the combined value of Parcels III and IV was $44,500.[4] He used the direct sales comparison method to value the land on Parcel IV, the land on Parcel III,[5] and the house on Lot 5.

He used the replacement method as a backup to check his figures for the house on Lot 5; the result was slightly lower so he

---

**3.** Markham could not move the house on Lot 4 back on the same lot because the second house on that lot remained, and the lot's non-conforming use status would be lost by the move. He moved the house to Lot 3–B and moved another recently acquired house to Lot 3–A.

**4.** Roberts's initial appraisal estimated a total value of $46,100, including $3,500 for the house on Lot 4. He testified at trial that he had mistakenly underestimated the expenses associated with ownership of the property, and that the actual value at the time of the taking was $1,900. The

mistake of $1,600 would lower the total value to $44,500.

**5.** In valuing the land on Parcel III, he determined that the highest and best use of the land on Lot 5 was to leave it as a single family residence, since the house on that land still had considerable value. Because the existing structures on Lot 4 were "small, very old, very dilapidated buildings," he determined that the highest and best use of Lots 3 and 4 was to combine the two into a multi-family lot and develop it with either a four-plex or a professional office.

adopted the higher market sales number as his estimate. He noted that the income approach is generally not used for single family homes such as the house on Lot 5.

Roberts testified that the house taken from Lot 4 was in "fairly sad condition" and "fairly well depreciated," so that he could not find any sales of homes in similar condition with such a short economic life. He also testified that there was little probability that anyone in the Kodiak market would pay to replace a similar structure on the lot. Thus, he used an "interim use" valuation approach for the house, which is a type of income analysis focusing upon the income the structure could produce before it would be removed to make way for a higher use for the property.[6] He determined that the value of the net income stream Markham could receive for the property over its useful life was $1,900.

In sum, then, Roberts testified to the following values:

| | |
|---|---|
| Land on Parcel III: | $ 6,500 |
| House on Lot 5: | 33,500 |
| House on Lot 4: | 1,900 |
| Land on Parcel IV: | 2,600 |
| Total: | $44,500 |

Thomas Dunagan then testified for the City as an expert appraiser who had reviewed Roberts's report and inspected each of the parcels involved. He testified that Roberts had correctly valued the properties.

Michael Renfro then testified for Markham. Renfro valued the total take at $57,170. He compared his appraisals to those which Roberts conducted for the City, and testified that "the approaches to value are similar in both cases.... The process that we went through is the same process." He testified that his estimates of value were generally somewhat higher than Roberts's, but repeatedly mentioned that any difference was "a difference of opinion." For example, to value the house on Lot 4, Renfro used a longer useful economic life, a higher monthly rent, and a lower capitalization rate, but he testified that the process was the same. To value the house on Lot 5, Renfro testified that he used both a market approach and a

replacement cost approach and "came out with pretty much the same numbers" as Roberts. He testified that he also calculated the value of that house using an income approach, but did not include it in his report because he "didn't think it pertained to the property." He testified that, generally speaking, "in residential properties you don't use the income approach. Traditionally, you don't use it."

Markham also sought to introduce the expert testimony of Ronald Greisen, a CPA, for the purpose of establishing certain losses from the taking. Judge Shortell heard Greisen's testimony outside the presence of the jury to determine the allowable scope of the testimony.

Greisen's proposed testimony was offered to establish three things: (1) that the loss of the non-conforming use status on Lot 4 was valued at $24,700; (2) that the income approach to valuation established the value of the house on Lot 5 at $60,700; and (3) that the taking resulted in a loss of a benefit from the management contract with Lundquist valued at $35,000. Judge Shortell allowed the testimony concerning the loss of the non-conforming use status. He disallowed the testimony regarding the income approach valuation of the house on Lot 5 and the loss relating to the Lundquist contract.

The jury returned a verdict of $46,400, representing a fair market value of property taken in the amount of $44,500, and other losses over and above the fair market value of the property in the amount of $1,900. The superior court entered a judgment in favor of Markham for $195, the difference between the jury award and the amount deposited with the court by the City under its declaration of taking. Markham moved for an award of $145,870 in attorney's fees; the superior court denied Markham any fees. Markham appeals.

## III. DISCUSSION

### A. Greisen Testimony

■ Markham appeals the superior court's ruling on the admissibility of testimony relating to the "lost profits" from the manage-

---

**6.** See supra note 5. He estimated the useful rental life of the house at five years.

ment contract.[7] The trial court ruled that the testimony was inadmissible because it rested upon false factual foundations.

 In the establishment of just compensation, neither party generally bears the burden of proof. *State v. 45,621 Square Feet of Land,* 475 P.2d 553, 554–56 (Alaska 1970). But the condemnee bears the burden of proving both lost profits and incidental damages with reasonable certainty by a preponderance of the evidence. *City of Kenai v. Burnett,* 860 P.2d 1233, 1244–45 (Alaska 1993); *State v. Hammer,* 550 P.2d 820, 827 (Alaska 1976).

Greisen's analysis asked what Markham would have to pay Lundquist so that Lundquist would be able to live in a house that rented for $900 a month, the assumed rental value of the house on Lot 5. Given a tax bracket of 28%, Lundquist would have to earn $1,250 to be left with $900 after taxes. Markham claimed that the $350 per month difference, which he did not have to pay Lundquist, was an advantage under the contract which was lost by the take. He translated that to $4,200 per year, and capitalized it at 12% to reach $35,000.[8]

This analysis rests upon at least two questionable assumptions: first, that the contract would have continued indefinitely if not for the taking; and second, that the benefit of the contract was extinguished by the taking. Although he was given the opportunity to make an offer of proof, Markham demonstrated neither.

The management contract was terminable at will by either party upon sixty days' notice. Markham testified that he saw "no problem" with the contract extending into

the future, but this court has indicated that such expectations may be insufficient as proof of incidental damages. *See Stroh v. Alaska State Housing Auth.,* 459 P.2d 480, 482 (Alaska 1969) (expectation or probability of lease renewal does not give tenant right to compensation in condemnation action).

More importantly, Markham was not able to demonstrate a factual foundation for the testimony because the benefit of the contract was not extinguished by the taking. Markham moved the house on Lot 5 back from the parcel taken by the City. After the house was moved, Lundquist continued to occupy the house rent-free and continued to manage Markham's other property, so that the relationship continued as before. Judge Shortell acknowledged that Markham may have had a viable claim for a four-month period in which Lundquist had to vacate the house so that it could be moved, but ruled that Markham could not receive compensation for loss of a contractual benefit indefinitely into the future when the loss had not in fact been incurred and the contract was still in existence.

We affirm the superior court's ruling since Markham did not demonstrate that Markham's benefit from the contract was terminated by the taking. Greisen's testimony as to the value of that benefit was therefore irrelevant.[9]

### B. Cost of Cure Recovery

 Markham next argues that if he is not allowed compensation for the loss of the benefits (or "lost profits") of the management contract with Lundquist, he should be granted compensation for the "cost of cure," or the

---

7. Markham does not appear specifically to argue in his opening brief that the house on Lot 5 should have been valued using the income approach. If he did, the argument would be meritless since his own expert acknowledged that the income approach was an improper method of valuation for that house.

8. That is, he divided $4,200 by .12. He explained that 12% was the rate of return that a real estate investor would want on his or her property. He admitted that if Lundquist moved out after 60 days, as he was entitled to do under the contract, the contract would be valued at $350 for two months, or $700.

9. Substantial portions of Markham's brief make reference to *State v. Hammer,* 550 P.2d 820 (Alaska 1976). In that case, this court decided that a bar owner could recover lost profits due to business interruption when the State took the bar owner's property, forcing the bar owner to relocate. *Id.* at 827. The case provides little support for Markham's position; indeed, Judge Shortell did allow Markham to try to prove damages during the four-month period in which the houses were being relocated on the properties.

cost to him of moving the house on Lot 5 back so that Lundquist could resume occupancy under their management agreement.[10]

The superior court did not allow testimony related to Markham's costs in moving the houses because the stipulation signed by Markham provided that he would have the right to remove either or both houses affected by the taking "at his sole expense." Markham's response is that the language of the stipulation required him to bear the expenses of the move as they are incurred, but that the City was still obligated to reimburse him for those expenses as part of his just compensation.

We affirm the superior court's ruling on the grounds that Markham assumed the cost of removal under the stipulation. Markham fails to persuade us that the stipulation language providing that he would bear the expense of moving the houses implied that the City would ultimately pay for the move as part of its just compensation payment.

## C. Evidence of "Admissions"

Markham further argues that the superior court erred in refusing to allow the introduction of two documents which he purports to be admissions of inaccurate appraisals or biased appraisers. We disagree.

The first document at issue is a letter from the City's attorney, Melvin Stephens, to the City Manager, Gary Bloomquist, written before the encroachment issue was stipulated out of the trial. Taken as a whole, the letter discusses the rules relating to attorney's fees in condemnation actions, in which the condemning authority can never recover costs and attorney's fees, but the condemnee can recover full fees if the jury is convinced that the property is worth more than 10% over the amount deposited with the court. *See* Civil Rule 72(k). The letter reads in pertinent part:

While I see little hope of negotiating a settlement with Mr. Markham ... let me emphasize that, when it comes to determining the value of the property being condemned, the City's case is only as strong as its appraisal evidence....

With someone like Jerry Markham, this rule [on attorney's fees] can turn condemnation litigation into something akin to a poker game in which the other side keeps raising and you can never win the pot. I mention this because it would be foolish to regard our appraisals in the present instance as unassailable. Even the most straight-forward appraisals are subject to legitimate differences of opinion and, in the present instance, the appraisal issues are by no means straightforward. One of Jerry's properties contains a dwelling which encroaches into both the strip of property the City needs to condemn and the existing right-of-way of Mill Bay Road so there can be several different views as to how one goes about determining the fair market value of that property.

Viewed in context, the letter was evaluating the risk that the City could be held responsible for Markham's attorney's fees and costs in light of the uncertainties surrounding valuation of property whose possible encroachment onto an existing right of way was disputed. Markham did not demonstrate before the trial court and does not demonstrate here why this amounts to either an admission that the final appraisal was flawed or a demonstration of some sort of bias by the appraiser. Judge Shortell correctly excluded the letter because it was irrelevant and it threatened to expand the scope of the trial by introducing to the jury issues relating to the ten-percent rule regarding attorney's fees under Civil Rule 72(k).[11]

---

10. The use of the term "cost of cure" is somewhat misleading. This court has held that the "cost of cure" may sometimes be an appropriate measure of damages when the property owner can show that a fair market valuation would not give adequate compensation. *City of Kenai v. Burnett*, 860 P.2d 1233, 1242 (Alaska 1993). Here, however, Markham litigated and was paid fair market value for the land and houses. He does not argue that he should be paid the cost of

moving the houses *instead of* the fair market value of the houses. He wants the "cost of cure" *on top of* the fair market value as incidental damages relating to the reestablishment of his relationship with Lundquist.

11. Judge Shortell also indicated that the communication was protected by the attorney-client privilege. That issue need not be addressed given the letter's irrelevance.

■ The second letter Markham sought to introduce was a handwritten note from Wayne Coleman, the project engineer for the Mill Bay Road project, to the city attorney. In it, Coleman discussed negotiations with Duane and Nancy Freeman concerning the purchase of all or parts of property adjacent to Markham's. The last paragraph stated, "Not gaining these properties in total detracts a bit from potential bargaining leverage w/ Markham but that should not be a significant factor." Judge Shortell decided not to admit the letter for the purpose of showing bias by the appraiser.

We also affirm this ruling. The handwritten letter was from the project engineer to the city attorney. The appraiser, Roberts, was neither the author nor the recipient of the letter and no connection was made between Roberts and this letter or any other reference to "bargaining leverage." The letter was irrelevant to the purpose for which Markham sought to introduce it.

### D. *Evidence of Tax Appraisal*

■ Markham further argues that the trial court erred in refusing to allow evidence of the Kodiak Island Borough's assessment of the property for tax purposes. In cross-examining Roberts, Markham's counsel sought to have him read a portion of his appraisal describing taxes and assessments by the Borough. After an objection by the City's counsel, the superior court dismissed the jury and heard the testimony at issue. Roberts explained that the tax assessments were included in his report because if he were to perform an income approach valuation of the property he would need to know the taxes assessed. But he testified that the figures "had no bearing whatsoever" on his value determination, after noting that assessments are often considerably higher or lower than true market value.

Markham's counsel argued that the data should come in under Alaska Rule of Evidence 705 as a disclosure of facts or data underlying an expert opinion. Even if the assessment were a basis for Roberts's opinion, Evidence Rule 705(c) allows a court to exclude underlying facts or data "if the danger that they will be used for an improper purpose outweighs their value as support for the expert's opinion." Here, the court acted well within its discretion to exclude the evidence.

This court has held that evidence of a tax assessment to establish fair market value is inadmissible, since such an assessment is "notoriously unreliable as a criterion of true value." *State v. 45,621 Square Feet of Land,* 475 P.2d 553, 557 (Alaska 1970). That case recognized, without deciding, that there might be an exception "where a taxing entity assesses at one level of value but later the same entity condemns at a lower value." *Id.* at 558 n. 12. That possible exception does not apply here because the assessment was conducted by the Borough and the condemnation was executed by the City.

### E. *Appointment of a Master*

Markham objects in his opening brief to the failure of the superior court to appoint a master. Civil Rule 72(h)(3) provides that a master will be appointed to determine the amount to be paid to each condemnee unless all parties agree to waive the master's hearing, in which case the matter will be set for trial. Here, co-defendants Duane and Nancy Freeman filed a request for a jury trial on July 15, 1992. On August 28, 1992, at a status hearing regarding the parties' stipulation on the encroachment issue, Markham asked the court to appoint a master. Judge Shortell then invited the parties to submit names of any people they would find acceptable to serve as masters.

Markham apparently never again raised the matter before the court. He filed a Memorandum to Set Civil Case for Trial on December 15, 1993, in which he noted that a jury trial had been demanded and estimated a trial time of five days. The Freemans were dismissed as parties on October 26, 1994, under the provisions of a stipulation. Following a telephonic hearing in which counsel for Markham repeatedly asserted that he was prepared to go ahead with the trial and that he "want[ed] to go ahead with the trial," the jury trial began on November 1, 1994.

Markham's reply brief indicates that his position is only that, if the case is remanded for a new trial, he be allowed to present his case to a master. He writes:

> The issue here is not whether Condemnee would not be bound by the verdict when on the eve of a long overdue trial, the Condemnor settled with a co-defendant demanding jury, and the Condemnee seeking a master nevertheless acquiesces in the jury trial then set. The question is whether following a reversal on appeal on other grounds ... Condemnee here can be said to have forever waived his right to a master on remand?

(Footnote omitted.)

Thus, given our affirmance of the judgment, this issue has been mooted.

### F. *Costs and Attorney's Fees*

The City deposited $46,205 with the court under its declaration of taking for Markham's property. This amount was distributed to Markham by court order in September 1992. The total jury award to Markham was $46,400. The court entered judgment in favor of Markham for the $195 difference, plus interest. The jury award was thus slightly over 0.42% greater than the amount deposited originally.

Civil Rule 72(k) governs costs and attorney's fees in eminent domain actions. That rule provides in part:

> Costs and attorney's fees incurred by a defendant must be assessed against the plaintiff if:
>
> . . . . .
>
> (3) the award of the court was at least ten (10) percent larger than the amount deposited by the condemning authority or the allowance of the master from which an appeal was taken by the defendant; [or]
>
> . . . . .
>
> (5) allowance of costs and attorney's fees appears necessary to achieve a just and adequate compensation of the defendant.

Markham filed a motion seeking $146,870 in attorney's fees and $10,342 in costs. After considering the motion, Judge Shortell issued a preliminary order denying costs and fees to Markham on February 9, 1995. His order included findings that: Markham was not entitled to fees and costs under Rule 72(k)(3) since the award was only slightly higher than the amount deposited; that the manner in which Markham litigated the case substantially and unreasonably increased the costs and fees incurred; that his cost and fee request appeared unreasonable; that he had produced no evidence that he incurred any out-of-pocket attorney's fees because throughout he either represented himself or had an associate represent him; and that he had failed to explain why the attorney's fees were necessary and reasonable, or why a fee award of $146,870 was necessary to achieve just and adequate compensation in a case where the property was valued at approximately $46,000.

Judge Shortell offered Markham the opportunity to file supplemental evidence to show that the fees and costs he claimed were reasonable and necessarily incurred. On July 11, 1995, Judge Shortell issued a final order denying fees and costs to Markham, noting that Markham had "made an insufficient factual showing to entitle him to an award of costs and fees, in any amount, under Civil Rule 72(k)(5)."

Markham appeals this decision. He asserts that full attorney's fees and costs are "the norm" under Rule 72(k). An examination of the rule shows that this is not the case. Full fees are awarded if the final award is more than ten percent greater than the amount deposited by the condemning authority. Rule 72(k)(3). They may also be awarded if they appear "necessary to achieve a just and adequate compensation." Rule 72(k)(5). Nothing suggests that full fees are the "norm" where the amount awarded is substantially the same as the amount deposited.

Markham implies that he should receive attorney's fees under Rule 72(k) because, "[a]fter over two years of litigation, and a five day trial, [he] received an award of [only] $195 due to jury error in understanding the City's appraisal evidence." This argument

goes to the merits of the jury's decision, which has been addressed above.

Judge Shortell's discussion of the necessity of an award of costs and fees to achieve adequate compensation was thorough and fair. He gave Markham more than one opportunity to show that an award of attorney's fees was necessary. Markham failed to do so. We affirm the superior court's denial of fees and costs.

## IV. *CONCLUSION*

The judgment of the superior court is AFFIRMED.