2003 WY 91

**Leslie McMACKIN, Personal Representative of the Estate of Harriette R. Brown, Appellant (Plaintiff),**

**v.**

**JOHNSON COUNTY HEALTHCARE CENTER, a Wyoming Hospital District; Mark S. Schueler, M.D.; Lawrence E. Kirven, M.D. Medical Associates of Johnson County, P.C.; Jennifer Sather, R.N.; and Vicki Blakely, L.P.N., Appellees (Defendants).**

No. 01–214.

Supreme Court of Wyoming.

Aug. 1, 2003.

Rehearing Granted in Part Sept. 4, 2003.

Don W. Riske and James R. Salisbury of Riske & Arnold, P.C., Cheyenne, WY, Representing Appellant. Argument by Mr. Riske.

Michael K. Davis of Yonkee & Toner, Sheridan, WY, for Johnson County Healthcare Center, Sather and Blakey; George E.

Powers, Jr. of Sundahl, Powers, Kapp & Martin, Cheyenne, WY for Dr. Schueler; Jeffrey C. Brinkerhoff and Timothy M. Stubson of Brown, Drew & Massey, LLP, Casper, WY, for Dr. Kirven and Medical Associates of Johnson County, Representing Appellees. Argument by Messrs. Davis, Brinkerhoff, and Powers.

Before HILL, C.J., and GOLDEN, LEHMAN *, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] Appellant, Leslie McMackin (McMackin), seeks review of the district court's order granting summary judgment to Appellees, Johnson County Healthcare Center (JCHC), Jennifer Sather, R.N. (Nurse Sather), Vicki Blakely, L.P.N. (Nurse Blakely), Mark S. Schueler, M.D. (Dr. Schueler), Lawrence E. Kirven, M.D. (Dr. Kirven), and Medical Associates of Johnson County, P.C. (MAJC). McMackin is the daughter of, and personal representative for the estate of, Harriette R. Brown (Brown), and she prosecuted these wrongful death and medical malpractice actions against the Appellees after her mother's death. Brown died of a stroke, and it is McMackin's contention that the Appellees were negligent in their treatment of Brown. The district court held that there was no genuine issue of material fact with respect to the "causation" prong of the elements necessary to constitute a medical malpractice claim and, on that basis, granted summary judgment for the Appellees.

[¶ 2] We will reverse on the basis that McMackin's malpractice claims fall under the "loss of chance" doctrine and the facts alleged in her complaint and contained in her evidentiary submissions opposing the Appellees' summary judgment motions satisfy the causation element, at least for purposes of summary judgment, i.e., those facts structure a genuine issue of material fact. The matter will be remanded to the district court for further proceedings consistent with this opinion.

## ISSUES

[¶ 3] McMackin articulates these issues:

I. Whether the district court erred in granting the defendants' motions for summary judgment.

1A. Whether appellees met the standards of establishing a prima facie case for summary judgment.

1B. Whether the district court erred in ruling that appellees had established a prima facie case by demonstrating that appellant had failed to show that any treatment would have altered or made any difference in the outcome for Harriette Brown.

JCHC, Nurse Sather, and Nurse Blakely rephrase the issue to be:

Did the trial court err in granting the Appellees' motions for summary judgment when Appellant could not raise a genuine issue of material fact as to whether or not any medical intervention would more probably than not have prevented the death of her mother?

Dr. Schueler states the issue on appeal as:

Whether the District Court properly granted summary judgment in a wrongful death case when the plaintiff failed to respond to the Defendants['] Motions for Summary Judgment with evidence which demonstrated that a genuine issue of material fact remained on the issue of causation.

Dr. Kirven and MAJC state the issues as:

A. Whether summary judgment should be affirmed because Appellant failed to present admissible evidence that the failure to treat transient ischemic attacks caused the cerebral hemorrhage and death?

B. Whether summary judgment for Appellee Kirven was appropriate on the additional grounds that Dr. Kirven's limited involvement caused no damages as admitted by Appellant's expert?

## FACTS

[¶ 4] In her amended complaint, McMackin averred that Brown was a resident at the Amie Holt Care Center in Buffalo from 1990 until her death on March 21, 1999. The

* Chief Justice at time of oral argument.

Amie Holt Care Center is a part of JCHC. Nurse Sather and Nurse Blakely were employed at JCHC and provided care to Brown at various times pertinent to this matter.

[¶ 5] In July of 1998, Brown began exhibiting symptoms of transient ischemic attacks (TIA's, also referred to as ministrokes), during which she would be confused and unable to verbalize. These symptoms were noted many times on Brown's chart and they continued to occur at irregular intervals after July of 1998. It is alleged that the Appellees took no action to refer Brown for a neurological workup, test her for causes of the TIA's, further diagnose, or prescribe meaningful treatment for her condition.

[¶ 6] At some time prior to 9:00 p.m., on March 7, 1999, a JCHC employee discovered that Brown was having difficulty talking and was crying. This was reported to Nurse Sather, who examined Brown and noted in her chart that Brown's speech was slurred, that she was crying and suffering anxiety, had slight facial drooping on the left side, and her left eye was closed. McMackin contends that there should have been an immediate medical response to her mother's condition, but there was not. Nurse Sather examined Brown periodically between 11:00 p.m., on March 7, 1999, and 4:30 a.m. the following day, but took no action until 4:30 a.m., at which time she called Dr. Kirven who advised Nurse Sather to wait for Brown's treating physician, Dr. Schueler. At 8:00 a.m. on March 8, 1999, Nurse Blakely examined Brown and noted the symptoms which had persisted throughout the night. Nurse Blakely called Dr. Schueler and noted on Brown's chart that the doctor would be there in about 30 minutes. At about 9:00 a.m. on March 8th, Dr. Schueler examined Brown and diagnosed a cerebrovascular accident (stroke) and arranged for her to be transferred to the hospital. Brown did not recover from the stroke, and she died on March 21, 1999, as a consequence of it.

[¶ 7] All Appellees filed motions for summary judgment. The record is voluminous; however, the basis for the grant of summary judgment is narrowly focused. The district court's order granting the motions for summary judgment contains these conclusions:

1. In a medical malpractice case, a plaintiff is required to prove through competent evidence that it is more likely than not that the defendant's negligence caused the plaintiff's injury. *Mize v. North Big Horn Hosp. Dist.,* 931 P.2d 229, 233 (Wyo.1997). Summary judgment is appropriate if the plaintiff cannot establish causation. *Id.*

2. The defendants have presented a prima facie case for Summary Judgment irrespective of the Affidavit of Richard L. Hughes, M.D., by demonstrating plaintiff's failure to show that any treatment would have altered the outcome for Harriette Brown.

3. The Court also finds that the plaintiff has failed to present competent evidence that any treatment would more likely than not have prevented the hemorrhagic stroke or made a difference in Mrs. Brown's prognosis or outcome.

4. The plaintiff has failed to present competent evidence that the alleged negligence of any of the defendants was a cause of the death of Harriette Brown.

5. No genuine issue of material fact remains on the issue of causation, and all defendants are entitled to judgment as a matter of law.

We will utilize other facts in the context of our discussion of the issues.

## STANDARD OF REVIEW

[¶ 8] When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. *Reed v. Miles Land and Livestock Company,* 2001 WY 16, ¶ 9, 18 P.3d 1161, ¶ 9 (Wyo.2001). A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record

from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. *Central Wyoming Medical Laboratory, LLC v. Medical Testing Lab, Inc.*, 2002 WY 47, ¶ 15, 43 P.3d 121, ¶ 15 (Wyo.2002); *Scherer Construction, LLC v. Hedquist Construction, Inc.*, 2001 WY 23, ¶ 15, 18 P.3d 645, ¶ 15 (Wyo.2001). If the evidence leads to conflicting interpretations or if reasonable minds might differ, summary judgment is improper. *Wyoming Game and Fish Commission v. Mills Company*, 701 P.2d 819, 821 (Wyo.1985).

■ [¶ 9] That standard of review is refined somewhat when applied to a negligence action and, in particular, a malpractice case:

Summary judgment is not favored in a negligence action and is, therefore, subject to more exacting scrutiny. *Woodard v. Cook Ford Sales, Inc.*, 927 P.2d 1168, 1169 (Wyo.1996). This is particularly true in malpractice suits. *DeHerrera v. Memorial Hospital of Carbon County*, 590 P.2d 1342, 1345 (Wyo.1979) (*quoting Holl v. Talcott*, 191 So.2d 40, 46 (Fla.1966)). We have, however, affirmed summary judgment in negligence cases where the record failed to establish the existence of a genuine issue of material fact. *See Krier v. Safeway Stores 46, Inc.*, 943 P.2d 405 (Wyo.1997) (failure to establish duty); *Popejoy v. Steinle*, 820 P.2d 545 (Wyo.1991) (failure of proof of underlying claim of a joint venture); *MacKrell v. Bell H2S Safety*, 795 P.2d 776 (Wyo.1990) (failure of proof of defendant's duty); *DeWald v. State*, 719 P.2d 643 (Wyo.1986) (cause element was pure speculation); and *Fiedler v. Steger*, 713 P.2d 773 (Wyo.1986) (failure to establish cause in a medical malpractice action).

*Garnett v. Coyle*, 2001 WY 94, ¶ 6, 33 P.3d 114, ¶ 6 (Wyo.2001).

[¶ 10] "The relative infrequency of decisions involving summary judgment in malpractice cases may exemplify the wide gulf between the ease of articulating the theory of summary judgment, and the difficulty of deciding particular cases." 1 David W. Louisell and Harold Williams, *Medical Malpractice*, ¶ 12.06 at 12–35 (2002):

Although the malpractice case appropriate for summary judgment on such issues as negligence or causation may be relatively rare, there are occasions where this device is an ideal remedy for the defense attorney for segregating a particular defense, e.g., that of the statute of limitations, from the case as a whole, and permitting its determination more or less in isolation, apart from the psychology of the trial itself. A motion for summary judgment appropriately timed, supported by carefully marshaled evidence, persuasively presented in a well documented fashion, can be a powerful weapon for defendant. *Id.*, at 12–35.

■ [¶ 11] In order to defeat a motion for summary judgment in a medical malpractice action, the plaintiff must establish: (1) the accepted standard of medical care or practice, (2) that the health care provider departed from that standard, (3) that the conduct was the legal cause of the injuries suffered, and, of course, (4) that the plaintiff was damaged by the conduct. *Oakden v. Roland*, 988 P.2d 1057, 1059 (Wyo.1999); *Sayer v. Williams*, 962 P.2d 165, 167–68 (Wyo.1998); *Fiedler v. Steger*, 713 P.2d 773, 775 (Wyo.1986). In this case, it is not disputed that summary judgment was inappropriate vis-à-vis the standard of care, the departure from that standard, or that McMackin suffered damage. The focus of this appeal is solely on the issue of causation.

## DISCUSSION

■ [¶ 12] As noted in the fact section of this opinion, the primary contention made by McMackin is that the Appellees did not respond in a manner consistent with the applicable standard of care in treating the TIA's that Brown experienced, i.e., they did not refer her to a specialist (neurologist) for a work-up or otherwise attempt to employ available treatments. Further, it is claimed that these omissions were the cause of Brown's "loss of a chance" to avoid the onset of the stroke. Secondarily, McMackin contends that once Brown presented with symptoms of a cerebral hemorrhage, Appellees failed to take any action to address that

condition, and those omissions were the cause of Brown's "loss of a chance" to survive the stroke. The following material helps to provide a superficial explanation of Brown's condition and provides background for our discussion:

### [¶ 13]   Ischemia

The greater number of strokes are ischemic in nature, (e.g., due to a lack of blood rather than hemorrhage). While very serious, ischemic strokes are not associated with the high mortality rates seen with hemorrhage. Perhaps as many as half of all ischemic strokes are preceded by one or more episodes known as "transient ischemic attacks" (TIA). These consist of a typical stroke syndrome (sudden onset of localized brain dysfunction) [and] subside in minutes or hours. While strokes occur without prior TIA's, and TIA's occur without strokes, there is a high correlation between the two, and TIA's are usually regarded as a stroke "early warning system."

The exact mechanisms of TIA's are not entirely understood. There may be many mechanisms, but a microembolism is often implicated. In the past, these episodes have been thought due to vascular spasm, and they are sometimes referred to as "little strokes." Most statistical studies have shown that about one-third of patients with TIA will have a permanent stroke, usually within a matter of months. Because of this, these attacks are usually regarded as a grave warning. Such patients often are given an intense medical investigation, to provide the most effective treatment available, hoping to prevent a subsequent stroke. As with hemorrhage, little can be done once an ischemic stroke occurs. The stroke results in the death of some brain tissue, which heals with a scar. The scar, of course, is not functional brain tissue, and while such patients usually survive the attack, a residual neurological deficit is the rule. The recovery of function typical of strokes appears to result when uninvolved parts of the brain learn to perform the lost functions.

Ideally, then, treatment is most effective before the permanent stroke occurs. Rational treatment can be based only on an accurate diagnosis—hence the intensive investigation of patients with TIA. Consideration is usually given to: (1) predisposing factors, (2) status of the blood vessels themselves, (3) factors that may precipitate ischemia, and (4) disorders that may masquerade as ischemic events.

5A Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties, § 34.27a(E) (Ischemia), at 265–66, Richard M. Patterson, Editor (4th ed.1997).

[¶ 14]   Susan Cutchall, M.D., was retained by McMackin to be an expert witness. It was her opinion that the TIA's suffered by McMackin should have been aggressively treated, that lack of treatment was a direct cause of the debilitating stroke, and that it was possible that more aggressive action immediately following the discovery that Brown had suffered a stroke could have ameliorated Brown's condition. Another expert employed by McMackin agreed with Dr. Cutchall's assessment. Dr. Cutchall specifically challenged the findings made by the Appellees' expert, Dr. Hughes, to the effect that Brown's condition could not have been diagnosed before her death, and that there was no treatment that could have prevented the hemorrhage or altered the outcome for Brown.

■ [¶ 15]   McMackin contends that the district court shifted the usual summary judgment burden to her—to come forward with expert testimony to establish causation—rather than placing it on Appellees to come forward with evidence establishing the lack of causation. *See Metzger v. Kalke*, 709 P.2d 414, 420–23 (Wyo.1985). We agree with McMackin that there are genuine issues of material fact and that Appellees were not entitled to judgment as a matter of law. Our reasoning, however, is founded in a doctrine known as "loss of chance." "Loss of chance" cases typically turn on causation:

> Generally, to prevail on a claim that the physician's failure to evaluate and treat a patient caused the patient to lose the chance for survival, the plaintiff must show the following:

(1) The patient has in fact been deprived of the chance for successful treatment; and

(2) The decreased chance for successful treatment more likely than not resulted from the physician's negligence.

Under this analysis, the causal connection between the defendant's omission and the decedent's stroke can be established if the defendant's omissions increased the risk of the harm suffered by the plaintiff.

1 Louisell & Williams, *Medical Malpractice, supra,* ¶ 8.07[2] at 8–94; ¶ 9.04[4] at 9–22–27; *Clementi v. Procacci,* 762 A.2d 1086, 1091–92 (Pa.Super.2000); 1 Barry R. Furrow, Thomas L. Greaney, Sandra H. Johnson, Timothy Stoltzfus Jost, Robert L. Schwartz, *Health Law* § 6–7b. at 308–12 (2nd ed.2000).

[¶ 16] In such cases, the "causation" element does not require that it be shown that the patient was certain to have recovered or improved with sound medical care, and it has often been said that the plaintiff may sustain the burden of establishing proximate causation with evidence that the patient could have been helped by proper treatment. John D. Hodson, Annotation, *Medical Malpractice: "Loss of Chance" Causality,* 54 A.L.R.4th 10 at 18 (1987 and Supp.2002); *Boryla v. Pash,* 960 P.2d 123 (Colo.1998). J. Stephen Phillips, *The "Lost Chance" Theory of Recovery,* The Colorado Lawyer, Vol. 27, No. 11, at 85 (November 1998); Kevin Joseph Willging, Case Note, *"Falcon v. Memorial Hospital: A Rational Approach to Loss–of–Chance Tort Actions,"* 9 Journal of Contemporary Health Law and Policy 545 (1993); *Alberts v. Schultz,* 1999–NMSC–15, ¶¶ 10–33, 126 N.M. 807, ¶¶ 10–33, 975 P.2d 1279, ¶¶ 10–33 (1999).

Where a physician is negligent in diagnosing a disease, and the resulting delay reduces the plaintiff's chances of survival (even though the chance of survival was below fifty percent before the missed diagnosis), a strong argument can be made that the physician should be responsible for the value of the chance that the plaintiff lost, so long as the initial act of the physician was itself negligent. First, the loss of an improved chance of survival or improvement in condition, even if the original odds were less than fifty percent, is an opportunity lost due to negligence. Much treatment of diseases is aimed at extending life for brief periods and improving its quality rather than curing the underlying disease. Much of the American health care dollar is spent on such treatments, aimed at improving the odds. In the words of the Delaware Supreme Court, "[i]t is unjust not to remedy such a loss." Second, immunizing whole areas of medical practice from liability by requiring proof by more than fifty percent that the negligence caused the injury fails to deter negligence conduct. As Judge Posner wrote in DePass v. U.S., "A tortfeasor should not get off scot free because instead of killing his victim outright he inflicts an injury that is likely though not certain to shorten the victim's life."

Courts have wrestled with the concept of loss of a chance or increased risk over the past twenty years, adopting one of several approaches to the problem. First, the traditionalists have refused to budge in considering loss chances below fifty percent. A minority of jurisdictions either expressly reject the loss of chance theory or have simply continued to adhere to the traditional strict causation standard. Their justifications include a fear that the jury is forced to speculate as to the causes of plaintiff's ultimate injury, with only disputed expert probabilities to guide them; that the jury will be misled and impressed by the probabilistic evidence; and that in many cases statistical evidence will be either unavailable or based on inadequate evidence.

A second approach is the "pure" lost chance approach, also called the "increased risk" or "relaxed causation" approach by some courts. If a plaintiff can prove that the defendant's negligence decreased the plaintiff's chance, no matter how slight, he can recover full damages from the trier of fact. Some courts have recognized the theory by classifying the destruction or reduction of a chance for recovery as an independent, compensable harm. These courts concentrate on the causal relationship between the negligent conduct and the statistical loss or reduction in the pa-

tient's chances for recovery. They apply the traditional evidentiary standard to this new kind of compensable interest. Most courts have relaxed one of the two traditional legal standards for a prima facie case of causation. Some have employed a standard which allows a plaintiff to meet his burden by proving that the defendant's negligence eliminated a substantial possibility of recovery or survival. Other courts have held that a plaintiff has met his burden by showing that the defendant's negligence increased the risk of harm or injury. Courts in these jurisdictions require that the jury find that the conduct was a "substantial factor" in causing the injury. Another judicial approach to these calculations is to treat the loss of a chance as a wrong separate from wrongful death, and allow the jury to set a dollar amount based on all the evidence, without mechanically applying a percentage to a total damage award.

The third approach is that of proportional "loss of chance," adopted by many courts that have considered the issue. The leading case is *Herskovits v. Group Health Cooperative* [664 P.2d 474 (Wash.1983)], where the court considered the consequences of a physician's missed diagnosis of lung cancer on the plaintiff's future. The court found that the plaintiff's chances of survival dropped from 39 percent to 25 percent, and that such a loss of a chance to survive was the proximate cause of his death. In the court's words, " * * * [t]o decide otherwise would be a blanket release from liability for doctors and hospitals any time there was less than a 50 percent chance of survival, regardless of how flagrant the negligence."

1 Furrow, Greaney, Johnson, Jost & Schwartz, *Health Law, supra,* at 309–11; *also see* John H. Derrick, Annotation, *Medical Malpractice: Liability for Failure of Physician to Inform Patient of Alternative Modes of Diagnosis or Treatment,* 38 A.L.R.4th 900 (1985 and Supp.2001); Jack W. Shaw Jr., Annotation, *Malpractice: Failure of Physician to Notify Patient of Unfavorable Diagnosis or Test,* 49 A.L.R.3d 501 (1973 and Supp.2002); Jerald J. Director, Annotation, *Malpractice: Physician's Failure to*

*Advise Patient to Consult Specialist or One Qualified in a Method of Treatment Which Physician is Not Qualified to Give,* 35 A.L.R.3d 349 (1971 and Supp.2002); C.T. Drechsler, Annotation, *Liability of Physician for Lack of Diligence in Attending Patient,* 57 A.L.R.2d 379 (1958 and Later Case Service 1994, Supp.2002).

[¶ 17] We hold that the doctrine of "loss of chance" is cognizable in Wyoming and that there is a genuine issue of material fact with respect to causation in this case. McMackin's contention is that the Appellees' conduct was the legal cause of Brown's loss of a chance for survival or for a better outcome. The allegations in her complaint, as well as the expert testimony she offered in resistance to the motion for summary judgment, preclude summary judgment in favor of Appellees on the issue of causation.

■ [¶ 18] We would be remiss if we did not at least provide some minimal guidance with respect to the measure of damages in such a case. There is an abundance of pertinent authority, but no clear-cut rule that can govern in all such cases. Instructions to the jury with respect to damages must be tailored to each case based on its peculiar facts. *See* 2 David W. Louisell and Harold Williams, *Medical Malpractice* ¶ 18.07 at 18–80—18–86 (2002); 1 Furrow, Greaney, Johnson, Jost & Schwartz, *Health Law, supra,* at 309–11; Martin J. McMahon, Annotation, *Medical Malpractice: Measure and Elements of Damages in Actions Based on Loss of Chance,* 81 A.L.R.4th 485 (1990 and Supp. 2002); Martin J. McMahon, Annotation, *Damages for Loss of Chance of Cure,* 12 Am.Jur. POF3d 621 (1991 and Supp.2001); and Todd S. Aagaard, Case Note, *Identifying and Valuing the Injury in Lost Chance Cases,* 96 Mich. L.R. 1335 (1998). This case presents one of the simplest and most straightforward set of circumstances, *i.e.,* the calamity suffered is death, and the full measure of damages would be those ordinarily allowed in a wrongful death action, reduced by the statistical or percentage loss of chance for survival. *See McKellips v. Saint Francis Hospital, Inc.,* 741 P.2d 467, 475–77 (Okl. 1987). Of course, the final determination of

an appropriate measure for damages must be based on the evidence presented at trial.

## CONCLUSION

[¶ 19] The summary judgment order is reversed and this matter is remanded to the district court for further proceedings consistent with this opinion.

LEHMAN, Justice, dissenting.

[¶ 20] In reaching its decision, the district court found appellees had presented a prima facie case for summary judgment irrespective of the affidavit of appellees' medical expert, Dr. Richard Hughes, by demonstrating McMackin's failure to show that any treatment would have altered the death of Ms. Brown. The district court also ruled that McMackin had failed to present competent evidence that any treatment more likely than not would have prevented the massive hemorrhage in Ms. Brown's brain, which resulted in her death. Therefore, the district court determined that no genuine issue of material fact remained on the issue of causation and appellees were entitled to summary judgment.

[¶ 21] In a medical malpractice action the plaintiff is required to prove that failure to perform a required duty proximately caused the damages alleged by the plaintiff. *Fiedler v. Steger,* 713 P.2d 773, 775 (Wyo.1986) (citing *Vassos v. Roussalis,* 625 P.2d 768, 772 (Wyo.1981)). Proximate cause means that the accident or injury must be the natural and probable consequence of the act of negligence. *Fiedler v. Steger,* at 775 (citing *McClellan v. Tottenhoff,* 666 P.2d 408, 414 (Wyo.1983) and *Harris v. Grizzle,* 625 P.2d 747, 753 (Wyo.1981)). The establishment of the element of proximate cause is normally a question of fact for the jury unless the evidence is such that reasonable minds could not disagree wherein such issue becomes a matter of law. *Stephenson v. Pacific Power & Light Co.,* 779 P.2d 1169, 1178 (Wyo.1989); *Kopriva v. Union Pacific Railroad Co.,* 592 P.2d 711, 713 (Wyo.1979).

[¶ 22] Wyoming Rules of Civil Procedure 56(e) further requires that both supporting and opposing affidavits with respect to motions for summary judgment be made on personal knowledge, set forth such facts as would be *admissible in evidence,* and show affirmatively that the affiant is competent to testify to the matters stated therein. Moreover, after the movant makes a prima facie showing that there are no issues of material fact involved and that an inquiry into the facts is unnecessary to clarify the applicable law, the burden of proof shifts to the opposing party who must show a genuine issue of material fact or come forward with *competent evidence* of specific facts countering the facts presented by the movant. The burden is on the nonmoving party to show specific facts as opposed to general allegations. The material presented must be admissible at trial. Conclusory statements are inadmissible. *Mercado v. Trujillo,* 980 P.2d 824, 825–26 (Wyo.1999) (citing *Nowotny v. L & B Contract Industries,* 933 P.2d 452, 455 (Wyo. 1997) and *Thomas by Thomas v. South Cheyenne Water and Sewer Dist.,* 702 P.2d 1303, 1304 (Wyo.1985)).

When the party moving for summary judgment has established a prima facie case, the burden of production shifts to the opposing party who then is obliged to marshal admissible evidence, **as opposed to general or conclusory allegations, establishing continuing viability of an issue of material fact. Such evidence must be competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation.**

*Campbell ex. rel Campbell v. Studer, Inc.,* 970 P.2d 389, 392 (Wyo.1998) (emphasis added) (quoting *Estate of Coleman v. Casper Concrete Co.,* 939 P.2d 233, 236 (Wyo.1997)). *See also Mize v. North Big Horn Hosp. Dist.,* 931 P.2d 229, 233 (Wyo.1997); *Harris v. Grizzle,* 625 P.2d at 751 and 753.

[¶ 23] In support of their motions for summary judgment, appellees tendered the pleadings of record; the deposition transcripts of Dr. Kirven, Dr. Schueler, Jennifer Sather, R.N., Dr. Cutchall, and Diana Ward–Collins, R.N.; the initial report issued by Dr. Cutchall; and the affidavit of Dr. Hughes. Review of Dr. Kirven's deposition transcript

evidences that he did not believe any treatment could have been given to Ms. Brown that would have been of assistance to her when he was contacted on March 8, 1999, at approximately 4:30 a.m. Dr. Kirven also indicated that, given Ms. Brown's medical history, administering treatment to her prior to that time on March 7 or 8, 1999, would have proven unsuccessful. Similarly, Dr. Schueler testified in his deposition that, given Ms. Brown's medical history and the fact that she had either experienced a stroke or a hemorrhage in her brain as of the morning of March 8, 1999, no treatment given to her earlier on March 7 or 8, 1999, would have mitigated her injury. These doctors also generally testified that the medical treatment they each rendered to Ms. Brown from July of 1998 until March 7, 1999, was appropriate given the specific situation and circumstances experienced by Ms. Brown.[1]

[¶ 24] Dr. Cutchall, a family practitioner, through McMackin's supplemental designation of expert witnesses and her own deposition, stated that Ms. Brown died from complications of a hemorrhagic stroke preceded by untreated TIAs and attributed the death of Ms. Brown to the negligence of each of the appellees. Dr. Cutchall, in her deposition, however, goes on to *merely theorize* that an ischemic/embolic/thrombotic stroke [2] may precede and be the cause of a hemorrhage and that she *suspected* that this was what occurred with Ms. Brown. In fact, she admitted that in the vast majority of cases, hemorrhagic strokes,[3] like those suffered by Ms. Brown, are unrelated to embolic strokes, and *no* medical literature exists that establishes a connection between the two.

[¶ 25] Specifically, Dr. Cutchall stated her theory was that Ms. Brown had recurring TIAs that were not treated, resulting in an embolic stroke which may have caused the hemorrhagic stroke. However, she stated that one cannot distinguish between an embolic stroke and a hemorrhagic stroke with a clinical examination and the only way to distinguish between the two is with a CT scan. Dr. Cutchall further admitted that the CT scan performed upon Ms. Brown did not reveal an embolic stroke that she testified may have occurred but revealed only a hemorrhagic stroke caused by a massive hemorrhage. Finally, Dr. Cutchall admitted that *absolutely no evidence existed* in this case that would establish that Ms. Brown had previously suffered from an embolic stroke, a crucial part of her theorized expert opinion.

[¶ 26] Dr. Cutchall also confirmed that Ms. Brown could have simply had a spontaneous bleed. She further advised that she *could not testify to a reasonable degree of medical probability* that the massive hemorrhage had not been present since the onset of Ms. Brown's TIA symptoms. Dr. Cutchall also admitted that, while TIAs may be a

---

1. Ms. Sather's deposition transcript simply evidences her recollection of what had occurred during the evening of March 7, 1999, and the morning of March 8, 1999, concerning the nursing care Ms. Brown received. Specific issues concerning causation were not addressed through this deposition.

   In similar fashion, the deposition transcript of Ms. Ward–Collins, the nursing expert designated by McMackin, deals almost exclusively with the subject of standard of care as it relates to nursing, and no issues regarding causation were addressed through this deposition. However, it is interesting to note that Ms. Ward–Collins testified that Vicki Blakely, L.P.N. met the standard of care for nurses regarding the nursing care she rendered to Ms. Brown on the morning of March 8, 1999.

2. "Embolic" is defined as "[r]elating to an embolus or to an embolism." "Embolism" is defined as an "[o]bstruction or occlusion of a vessel by an embolus." "Embolus" is defined as "[a] plug, composed of a detached thrombus or vegetation, mass of bacteria or other foreign body, occluding a vessel." "Thrombotic" is defined as "[r]elating to, caused by, or characterized by thrombosis," while "thrombosus" is defined as "[f]ormation or presence of a thrombus; clotting within a blood vessel which may cause infarction of tissues supplied by the vessel." "Thrombus" is defined as "[a] clot in the cardiovascular systems formed during life from constituents of blood; it may be occlusive or attached to the vessel or heart wall without obstructing the lumen." *See* Steadman's Medical Dictionary, 25th Edition Illustrated (1990).

   For ease of reference an ischemic/embolic/thrombotic stroke will be simply referred to as an embolic stroke.

3. "Hemorrhagic" is defined as "[r]elating to or marked by hemorrhage." "Hemorrhage" is defined as "[h]emorrhea; bleeding; an escape of blood through the ruptured or unruptured vessel walls" or "[t]o bleed." *See* Steadman's Medical Dictionary, 25th Edition Illustrated (1990).

predictor of an embolic stroke, TIAs are not a predictor of a hemorrhagic stroke, the condition that caused Ms. Brown's death. In addition, Dr. Cutchall affirmed that it is often common, even after a full neurological work-up is performed on a patient experiencing TIAs, for the specific etiology of the TIAs to remain undetermined.

[¶ 27] Based upon her assumption that Ms. Brown may have had an embolic stroke preceding the hemorrhagic stroke, Dr. Cutchall proffered various treatments that could have been ordered for Ms. Brown before the massive hemorrhage. However, Dr. Cutchall and the other medical experts stated that no known treatment would have prevented the cerebral hemorrhage which took Ms. Brown's life. Further, there is primarily no treatment for a cerebral hemorrhage after it occurs other than comfort and care. Critically, Dr. Cutchall also stated that she did not personally review the CT scan taken of Ms. Brown but only reviewed the CT scan reports as a basis for her opinion. She further stated that she did not hold herself out as a neurologist and that a neurologist would have a much better opinion of the cause and possible treatment of Ms. Brown's massive cerebral hemorrhage due to a neurologist's more specific expertise in the area.

[¶ 28] In his affidavit submitted by appellees in support of their motions for summary judgment, Dr. Hughes, a neurologist, opined *based upon a reasonable degree of medical probability* that Ms. Brown's history was consistent with a condition known as amyloid angiopathy, which is a well documented condition related to aging that causes a crystal-like substance to form in the arteries of the brain.[4] This condition is often preceded by multiple episodes clinically indistinguishable from TIAs. The artery eventually breaks in the periphery, causing a hemorrhage. Dr. Hughes also stated that Ms. Brown's medical history evidenced that she had previously suffered from white matter disease, which was consistent with a hemorrhage secondary to amyloid angiopathy. Moreover, amyloid angiopathy is normally diagnosed only after there has been a hemorrhage, and there is no treatment other than blood pressure monitoring, which was performed in this case.

[¶ 29] Alternatively, Dr. Hughes suggested that an artery in Ms. Brown's brain may have became blocked or occluded, and the resulting pressure caused it to rupture and hemorrhage. However, Dr. Hughes stated that this scenario was unlikely since Ms. Brown experienced a large cerebral bleed as demonstrated by the CT scan, hemorrhages caused by a prior embolism normally do not result in as much bleeding, and only 1 out of 200 hemorrhages is the result of a prior embolism. Therefore, Dr. Hughes concluded that the cerebral hemorrhage suffered by Ms. Brown was not preceded by or caused by an embolic stroke. Dr. Hughes also attested that a hemorrhage can result from hypertension; but this was unlikely in Ms. Brown's case since bleeding caused by hypertension is usually deep within the brain, and Ms. Brown's bleeding occurred on the periphery as shown by the CT scan. Therefore, Dr. Hughes concluded that the probable cause of the cerebral hemorrhage incurred by Ms. Brown was amyloid angiopathy. He also stated that there was no treatment that would have prevented or altered the cerebral hemorrhage suffered by Ms. Brown regardless of which of the three events he referred to had caused that hemorrhage.

[¶ 30] Further, Dr. Hughes stated that if medications were given to Ms. Brown to prevent stroke, it would have likely precipitated a bleed and Ms. Brown would have died even earlier. Finally, Dr. Hughes opined that, even if Ms. Brown had been treated by a neurologist who was aware of an impending stroke, the outcome would have been no different. (Id.)

[¶ 31] Accordingly, given my independent review of the record, I agree with the district court's determination that appellees present-

---

**4.** It is recognized that the district court expressly did not rely upon the affidavit of Dr. Hughes in making its determination that appellees had established a prima facie case for the granting of summary judgment. However, it is well established that this court may affirm a district court's grant of summary judgment under any proper legal theory on the record presented. *Vernon T. Delgado Family Ltd. Partnership v. Shaw,* 9 P.3d 982, 983 (Wyo.2000) (quoting *Hulse v. First Interstate Bank of Commerce–Gillette,* 994 P.2d 957, 958–59 (Wyo.2000)).

ed adequate evidence, even outside consideration of the substantial affidavit submitted by Dr. Hughes, to make a prima facie showing that no genuine issue of material fact existed as to the issue of causation. Upon consideration of the affidavit of Dr. Hughes, the district court's conclusion is certainly even more supported. Therefore, I would hold that the district court did not err in its determination that appellees had presented adequate evidence to make a prima facie showing for the granting of summary judgment.

[¶ 32] As indicated above, after the movant makes a prima facie showing that there are no issues of material fact involved and that an inquiry into the facts is unnecessary to clarify the applicable law, the burden of proof shifts to the opposing party who must show a genuine issue of material fact or come forward with *competent evidence* of specific facts countering the facts presented by the movant. However, review of the testimony of Dr. Cutchall noted in detail above evidences her opinion concerning causation is conjectural at best, and a more thorough review of her total testimony evidences that her opinion as to causation is merely speculative. Indeed, when asked the specific basis for her opinion concerning causation, Dr. Cutchall admitted that the foundation leading her to this conclusion was simply her own personal patient history. Dr. Cutchall could not give any scientifically based detailed analysis.

[¶ 33] Dr. Mitchell Felder's affidavit was also proffered in opposition to the summary judgment motions. Dr. Felder, a neurologist, stated through an opinion letter attached to his affidavit, that the cause of Ms. Brown's death was a massive hemorrhage which was preceded by untreated TIAs. He offered several possible alternatives as to the cause of the fatal hemorrhage but did not conclude which of them was its probable cause. He also, like Dr. Cutchall, describes theoretical treatments that could have been given to Ms. Brown concerning the TIAs she was experiencing. However, Dr. Felder did not state that these treatments would have in any way prevented the massive hemorrhage that Ms. Brown experienced. Again, the

statements of Dr. Felder are solely conclusory and, as such, fall short of establishing a material question of fact with respect to causation.

[¶ 34] The principles adopted by this court in *Weber v. McCoy,* 950 P.2d 548 (Wyo. 1997) and *Vassos v. Roussalis,* 658 P.2d 1284 (Wyo.1983) make it clear that medical experts need not assert their opinions through utilization of specific terms to be valid. *However, the expert opinion rendered must be based in fact and on an adequate foundation. Expert opinion cannot be based on mere inferences, conclusions, and assertions, as such opinion is not sufficient to defeat summary judgment.* Garnett v. Coyle, 2001 WY 94, ¶¶ 3–6, 33 P.3d 114, ¶¶ 3–6 (citing *McClellan v. Britain,* 826 P.2d 245, 247 (Wyo.1992); *Mayflower Restaurant Co. v. Griego,* 741 P.2d 1106, 1113 (Wyo.1987); *Stundon v. Sterling,* 736 P.2d 317, 318 (Wyo. 1987)); *Blackmore v. Davis Oil Co.,* 671 P.2d 334, 336–37 (Wyo.1983) (quoting *Gennings v. First Nat'l Bank at Thermopolis,* 654 P.2d 154, 155 (Wyo.1982)).

[¶ 35] Certainly, while both experts proffered by McMackin testified that Ms. Brown died of a cerebral hemorrhage in her brain that was preceded by untreated TIAs, neither could sufficiently draw any further specific conclusion regarding the cause of her death and that appellees' actions contributed to her death. Simply put, in this case an essential element, the causal connection between the alleged breach of a duty owed and the injury sustained, is missing.

[¶ 36] Furthermore, when reviewing expert testimony, a trial court is required to act as a "gatekeeper" to determine the reliability of the proffered expert testimony by applying the flexible criteria set forth in our opinion in *Bunting v. Jamieson,* 984 P.2d 467, 471–73 (Wyo.1999) (formally adopting in Wyoming the four non-exclusive tests to the facts at hand enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–94, 113 S.Ct. 2786, 2796–97, 125 L.Ed.2d 469 (1993)). A trial court must be given broad latitude in determining whether expert testimony is based upon reliable scientific methodology so as to make the conclusions offered by an expert admissible. Thus,

our scope in reviewing such issues is very narrow—reversing the trial court's decision only if we conclude that it abused its discretion in excluding expert testimony. *Holland-er v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1206–07 (10th Cir.2002).

[¶ 37] As indicated above, the district court was presented with voluminous materials to assist it in its ruling on the motions for summary judgment and ultimately applied the *Daubert* principles before rendering its decision. Upon review of the district court's analysis, I cannot conclude that the district court clearly abused its discretion in rendering its decision. To the contrary, the district court, based on the specific materials provided to it, reasonably determined that the evidence presented was insufficient to scientifically establish that a cause-effect connection existed in this case. Therefore, I concur with the conclusion reached by the district court that McMackin failed to present competent and admissible evidence that any treatment more likely than not would have prevented the massive hemorrhage in Ms. Brown's brain, which resulted in her death.

[¶ 38] The majority bases its reasoning on the "loss of chance" doctrine. Neverthe-less, the application of that doctrine does not obviate the mandate that a plaintiff must show by competent and admissible evidence the causal connection between the defendant's omission and the damage allegedly suffered. I agree that expert testimony must be based on reliable methodology, but need not be so persuasive as to meet the proponent's ultimate burden of proof, and that if the admissibility bar is raised too high, the court usurps the jury's duty to evaluate the expert's credibility and weigh the evidence. *See Bunting*, 984 P.2d at 473 and *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 156 (3rd Cir.1999). However, this did not occur in this instance because McMackin failed to present any expert opinion based on reliable scientific foundation.

[¶ 39] I would, therefore, affirm the ruling of the district court granting summary judgment in favor of appellees.